**Jerry D. SAVAGE, Plaintiff,**

v.

**UNION PACIFIC RAILROAD COMPANY, Defendant.**

**No. LR–C–97–787.**

United States District Court,
E.D. Arkansas,
Western Division.

Aug. 24, 1999.

Stephen C. Engstrom, Wilson, Engstrom, Corum & Coulter, Little Rock, AR, M. Melinda Sanderson, Abele & Sanderson, L.L.C., St. Louis, MO, for Jerry D. Savage, plaintiff.

William H. Sutton, Guy Alton Wade, Friday, Eldredge & Clark, Little Rock, AR, for Union Pacific Railroad Company, defendant.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

Before the Court is Defendant's Motion to Exclude Plaintiff's Expert, Dr. Alan Boyd. More accurately, it is a motion to exclude his causation testimony. Defendant first raised the issue of the sufficiency of Dr. Boyd's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) in its Pretrial Information Sheet filed on January 11, 1999. The *Daubert* issues were discussed in a pretrial telephone conference conducted on February 1, 1999. In that hearing the Court resolved to postpone the trial of this matter to allow Defendant the opportunity to file a formal motion to exclude Dr. Boyd's testimony and to allow Plaintiff ample time to respond. The parties have now filed their pleadings, and the Court has carefully considered the issues and applicable authority. Based upon the record herein, the Court has decided that further testimony pursuant to Fed. R. Evid 104(a) will not be necessary. For the reasons set forth in this Memorandum Opinion, the Court will grant Defendant's motion to exclude the causation testimony of Dr. Boyd. In addition, the court will exclude the testimony of Dr. W.R. McKiever to the extent Plaintiff intends to proffer him as an expert on causation.

## I. Background

Plaintiff, Jerry D. Savage, brought this action against Defendant pursuant to the Federal Employer's Liability Act, 45 U.S.C. § 51, *et seq* ("FELA"). Plaintiff has worked as a carman/welder for Defendant Union Pacific Railroad since 1971. Until February 1997, Plaintiff was employed at the railroad's McGhee, Arkansas, facility, where he repaired rail cars.

Plaintiff alleges that during his employment at the McGhee facility, he was exposed to large amounts of toxic substances. Plaintiff describes his work environment as follows:

In the Seventies and Eighties and until the mid nineties, there was no building for carmen to work under. (Lang dep. [page] 19 line 20 through page 20 line 9 Exhibit "A")[.] [Plaintiff] worked the day shift approximately twenty years of his time with the railroad at McGhee. [Plaintiff's] work floor consisted of creosoted switch timbers, which the men would lie on while working under cars. They had no building over them to protect them from the sun and rain.

There were no drip pans to collect overflowing diesel fuel and fuel oils. It was the practice to dump toxic substances on the ground. No protective clothing was suggested or required for working with the various chemicals used by the carmen in servicing engines or repairing cars. Those chemicals included benzene, which was used to degrease car parts. It splattered on employees while it was being applied and soaked into the ground/crossties in their work area. The employees also worked repairing carbon black cars and rerailing carbon black cars . . . .

The contamination was so extensive that fumes could be seen and smelled rising from the ground in the summer. (Savage dep. pp. 36–38 Exhibit "C"). When it rained, they would continue to work and the ground would become toxic soup that would soak their clothes and splash their faces. The ground would be slick with various oils when it rained. Plaintiff "wallowed" in the chemicals while performing his work (Lang dep. pp. 18–19 Ex. "A"; and Savage dep. pp. 36–38 Exhibit "C")[.] Savage would come home each day with his clothing soaked with oils and covered from head to foot with oils and grease . . . .

*See* Plf.'s Resp. to Def.'s Motion to Exclude at 2–3.

It appears that by 1989, the railroad recognized that the McGehee facility was contaminated and that the facility failed to provide protection from harsh weather conditions. Material Safety Data Sheets ("MSDS sheets") for products used in the McGehee facility indicate that employees were working with numerous chemicals, including benzene, diesel/furnace oil, car journal oil, carbon black, methylene chloride, creosote and diesel fuels. *See* Ex. G. to Plf.'s Resp. Plaintiff alleges that in 1992, total petroleum hydrocarbons (TPH) in the soil ranged up to 7403 mg/kg of soil. *See* Ex. I to Plf.'s Resp.

In 1987, Plaintiff developed a squamous cell carcinoma in the webbing between the fingers of his right hand. In 1991, Plaintiff developed a keratoancanthoma, a skin lesion classified as a form of skin cancer by expert witnesses, on the back of his right wrist. In 1995, Plaintiff developed a basal cell carcinoma on his face.[1] Recently, five nonmalignant lesions were removed from his hand and face. Plaintiff alleges that he developed the basal cell carcinoma on his face due to the exposure to "sun and other environmental hazards" while employed at the McGhee facility. In order to establish causation, Plaintiff has tendered as an expert witnesses Dr. Alan Boyd. Dr. Boyd has testified that Plaintiff's exposure to "petroleum products" caused or contributed to his development of skin cancer. In

---

1. Due to the statute of limitations, the only cancer formally at issue in this case is the basal cell carcinoma that developed in 1995.

addition, Plaintiff has now stated that he also intends to call his treating physician, Dr. W.R. McKiever to testify that Plaintiff's exposure to petroleum products caused or contributed to the development of his skin cancer.

## II. Discussion

### A. The Daubert Standard

*Daubert* provides the starting point by requiring district courts as "gatekeepers" to determine the admissibility of proffered scientific testimony. This Court provided an extended presentation of what Justice Blackman's opinion requires of trial courts in *National Bank of Commerce v. Dow Chemical Co.*, 965 F.Supp. 1490 (E.D.Ark. 1996), *aff'd* 133 F.3d 1132 (8th Cir.1998), and described those requirements again in *National Bank of Commerce v. Associated Milk Producers, Inc.*, 22 F.Supp.2d 942 (E.D.Ark.1998)("*AMPI*"). The Court quotes extensively from its opinion in *Dow Chemical Co.* in order to put its analysis of the evidence in its doctrinal context:

> We start with Justice Blackmun's opinion in *Daubert*. After concluding that the Frye Rule ("that austere standard") should not be applied in federal trials, *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794, Justice Blackmun went on to discuss the proper test for admissibility of scientific evidence. He pointed out that Rule 702 nowhere refers to the "general acceptance" test of *Frye*. He then explained as follows:
>
>> That the Frye test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.
>> The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an ex-

pert may testify. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" an expert "may testify thereto." The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.

> \* \* \* \* \* \*

> But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation— i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert*, 509 U.S. at 589–90, 113 S.Ct. at 2794–95 (emphasis in original). It is important also to consider Justice Blackmun's footnote to this observation:

> We note that scientists typically distinguish between "validity" (does the principle support what it purports to show?) and "reliability" (does application of the principle produce consistent results?).

> \* \* \* \* \* \*

> ... our reference here is to evidentiary reliability—that is, trustworthiness.

> \* \* \* \* \* \*

In a case involving scientific evidence, evidentiary reliability will be based upon scientific validity.

*Id.* at n. 9. The majority opinion then goes on to state that:

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."

\* \* \* \* \* \*

Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. That these requirements are embodied in Rule 702 is non surprising. Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Rules 702 and 703. Presumably, this relaxation of the usual requirement of first-hand knowledge—a rule which represents "a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information.' " Advisory Committee's Notes on Fed. Rule Evid. 602 (citation omitted)—is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

*Daubert,* 509 U.S. at 591–92, 113 S.Ct. at 2796.

With this doctrinal background in mind, Justice Blackmun then provides the trial judge with practical instructions on how to proceed when expert scientific testimony is challenged:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.

Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested, "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Green at 645. *See also* C. Hempel, Philosophy of Natural Science 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test"); K. Popper. Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th Ed.1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability").

Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a sine qua non admissibility; it does not necessarily correlate with reliability, see S. Jasanoff. The fifth Branch: Science Advisors as Policymakers 61–76 (1990), and in some instances well-grounded but innovative theories will not have been published, see Horrobin, The Philosophical Basis of Peer Review and the Suppression of Innovation, 263 J. Am. Med. Assn. 1438 (1990). Some propositions, moreover, are too particular, too new, or of too

limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. *See* J. Siman, Reliable Knowledge: An Exploration of the Grounds of Belief in Science 130–133 (1978); Relman and Angell, How Good Is Peer Review?, 321 New Eng. J. Med. 827 (1989). The fact of publication (or lack thereof) in a peer-reviewed journal thus will be relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

Additionally, in the case of particular scientific technique, the court ordinarily should consider the known or potential rate of error, see, e.g., *United States v. Smith*, 869 F.2d 348, 353–354 (7th Cir.1989) (surveying studies of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation. *See United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir.1978) (noting professional organization's standard governing spectrographic analysis), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." *United States v. Downing*, 753 F.2d at 1238. *See also* 3 Weinstein & Berger ¶ 702[03], pp. 702–41 to 702–42. Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique that has been able to attract only minimal support within the community," *Downing*, supra, at 1238, may properly be viewed with skepticism.

The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Daubert*, 509 U.S. at 592–95, 113 S.Ct. at 2796–97. The *Daubert* opinion also instructs the trial judge to be mindful of the provisions of Rules 703, 706 and 403. Finally, the trial judge is admonished that if she or he concludes that a scintilla of evidence supporting a position is insufficient to allow a reasonable jury to conclude that the position is more likely than not true, the court remains free to direct a judgement, see Fed. Rule Civ. Proc. 50(a), and likewise to grant summary judgment, Fed. Rule Civ. Proc. 56. This is to remind us that scientific evidence may raise questions not only as to admissibility but also as to sufficiency. It is interesting to note that Justice Blackmun cites the case of *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir.1989), *modified*, 884 F.2d 166 (5th Cir.1989), in support of this proposition. In summary, Justice Blackmun states that the rules of evidence (especially Rule 702),

> ... do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

*Daubert*, 509 U.S. 579, 113 S.Ct. at 2799. *Daubert* holds that admissibility under Rule 702 is governed by Rule 104(a), which requires the judge to conduct "preliminary fact-finding, to make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and

whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* 509 U.S. 579, 113 S.Ct. at 2796. Thus, before admitting scientific evidence, the Court must, inter alia, determine whether the theory advanced by the expert has been subjected to the "scientific method." *Id.* 509 U.S. 579, 113 S.Ct. at 2795, 2797. And the focus of this inquiry must be on "principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. 579, 113 S.Ct. at 2797.

"Scientific validity" and "fit" inquiries may overlap. For example, if published theories and studies purport to prove A, yet from those studies an expert concludes B, it may be that the expert's reasoning process is not valid, although the studies or theories she relies upon are. In sum, there may be a lack of "fit" between the studies and theories and the conclusion the expert draws from them.

Each step of the experts' methodology must be scientifically valid. *See In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3d Cir.1994). For example, in a situation where an expert relies on studies of the effects of animal exposure to a particular chemical to prove similar effects in humans, "[c]ourts must assess the scientific validity of the hypothesis proffered to justify such an extrapolation." Developments in the Law—Confronting the New Challenges of Scientific Evidence, 108 Harv.L.Rev. 1481, 1536 (1995).

*National Bank of Commerce v. Dow,* 965 F.Supp. at 1493–96.

### B. The FELA Causation Standard

■■■ Plaintiff brings his negligence suit against Union Pacific under FELA. Under FELA, railroad companies are liable in damages to any employee who suffers injury due to the railroad's negligence. 45 U.S.C. § 51. To recover under FELA, Plaintiff must prove the common-law elements of negligence, including duty, breach, foresee ability and causation. However, the Eighth Circuit has held that "[u]nder FELA, the plaintiff carries only a slight burden on causation." *Paul v. Missouri Pacific R.R. Co.,* 963 F.2d 1058 (8th Cir.1992); *see also Harbin v. Burlington Northern R. Co.,* 921 F.2d 129, 131 (7th Cir.1990)( "the quantum of evidence required to establish liability in a FELA case is much less than in an ordinary negligence action."); *Deutsch v. Burlington Northern R. Co.,* 983 F.2d 741, 743 (7th Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). Under FELA, the plaintiff must provide a reasonable basis for a jury to conclude that the employer's negligence played any part, even the slightest, in producing the injury for which damages are sought. *Paul,* 963 F.2d at 1061 (citing *Rogers v. Missouri Pac. R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)). Discretion to engage in common sense inferences regarding issues of causation and fault is exclusively vested with the jury "in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." *Walden v. Illinois Cent. Gulf R.R.,* 975 F.2d 361, 364 (7th Cir.1992) (citing *Rogers,* 352 U.S. at 510, 77 S.Ct. 443, 1 L.Ed.2d 493). Despite FELA's lower standard of proof, a plaintiff still bears the burden of presenting evidence from which a jury could conclude a "probable" or "likely" causal relationship as opposed to merely a "possible" one. *Dukes v. Illinois Central Railroad Co.,* 934 F.Supp. 939, 944 (N.D.Ill.1996); *Edmonds v. Illinois Cent. Gulf R.R. Co.,* 910 F.2d 1284, 1288 (5th Cir.1990) ("plaintiff must show more than a possibility that a causal relation existed")(citing *Moody v. Maine Cent. R.R.,* 823 F.2d 693, 695 (1st Cir.1987)).

### C. Reconciling the Daubert Standard with the FELA Causation Standard

In light of the above, it is not difficult to see the tension between the *Daubert* standard for admission of expert testimony and the FELA standard on causation for submission of a case to a jury. However, courts have addressed this precise issue.

Perhaps the most thorough treatment of the topic can be found in the opinion of *In re Conrail Toxic Tort Fela Litig.*, No. CIV. A 94–11J, CIV. A 94–4J, 1998 WL 465897 (W.D.Pa. Aug 4, 1998). In *Conrail,* the Plaintiff alleged that his exposure to workplace chemicals caused "sick sinus syndrome" which in turn caused coronary artery disease. The defendant moved to exclude the testimony of plaintiff's expert on causation. After reviewing the standards for admissibility of expert testimony under *Daubert,* the court launched into an analysis of a FELA case, *Hines v. Consolidated Rail Corp.*, 926 F.2d 262 (3d Cir. 1991), where the Third Circuit stated:

> [T]he standard [of causation] under FELA can significantly influence a determination of the admissibility of [an expert's] testimony. By enacting FELA, Congress desired to secure jury determinations in a larger proportion of cases than would be true of ordinary common law actions. Indeed, jury determinations were intended to be part of the FELA remedy.

*Conrail,* 1998 WL 465897, at \*5 (quoting *Hines,* 926 F.2d at 269.) The *Conrail* court further discussed the analysis of *Hines* contained in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir.1994)("Paoli II"), a case involving exposure to toxic PCBs. The court in *Paoli II* began its treatment of *Hines* by noting that "when a doctor employs standard diagnostic techniques, his or her testimony is much more readily admissible." *Id.* at 757 n. 27. The court recognized the possibility that under *Hines,* a differential diagnosis in a FELA case would be admissible even

in the absence of a plausible scientific explanation. *Id.* at 759 n. 27. The court reasoned that an expert's use of "traditional techniques of differential diagnosis," would potentially render a resulting opinion admissible. *Id.*[2] However, the court emphasized the importance of the use of standard techniques to rule out alternative causes. *Id.* "[W]here a defendant points to a plausible alternative cause and the doctor offers no explanation for why he or she has concluded that was not the sole cause, that doctor's methodology is unreliable." *Id.*

Ultimately, the *Conrail* court found that *Daubert* is properly applied in a FELA case. The court summarized its holding as follows:

> To recapitulate, then, as long as plaintiff's expert presents scientifically reliable evidence that the toxic exposure could have played some role, however small, in causing plaintiff's injuries, the testimony should be admitted under [the lower FELA standard set forth in] *Hines.* On the other hand, *Daubert's* standard of admissibility "extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *Paoli II,* 35 F.3d at 743. Thus, if the expert's conclusion—or any inferential link that undergirds it—fails under *Daubert* to provide any evidence of causation, it must be excluded, even under *Hines'* liberal approach to admissibility.

*In re Conrail,* 1998 WL 465897 at \*6.

A similar conclusion was reached by the Ninth Circuit in *Claar v. Burlington*

---

**2.** The court elaborated on what it considered the use of standard diagnostic procedures by the expert in *Hines:*

> [The expert] used traditional methods to form his opinion by reviewing a variety of background factors that are normally investigated in the medical profession, including: Hines' histories of other exposures to toxins, drugs, and alcohol, the length of his residences, employment experience, PCB-related symptoms, blood tests, liver function tests, immunological tests, gas chromatograph tracings, a number of reports as

well as all of the scientific literature that indicates that PCBs can be associated with severe health problems, including cancer. *Paoli II,* 35 F.3d at 759 n. 27 (quoting *Hines,* 926 F.2d at 274). See also the discussion of "differential diagnoses" in National Bank of Commerce v. Associated Milk Producers, Inc., 22 F.Supp.2d 942, 963–67 (E.D.Ark.1998). Clearly Plaintiff's experts here have neither scientifically "ruled out" other possible causes or "ruled in" creosote as a cause of Plaintiff's basal cell carcinoma.

*Northern Railroad Company,* 29 F.3d 499 (9th Cir.1994). The Court's opinion is instructive:

> The standard of causation under FELA and the standards for admission of expert testimony under the Federal Rules of Evidence are distinct issues and do not affect one another.... It is true that under FELA the quantum of evidence sufficient to present a jury question of causation is less than it is in a common law tort action .... This does not mean, however, that FELA plaintiffs need make no showing of causation. Nor does it mean that in FELA cases courts must allow expert testimony that in other contexts would be inadmissible. It means only that in FELA cases the negligence of the defendant need not be the sole cause or whole cause of the plaintiff's injuries. FELA plaintiffs must still demonstrate some causal connection between a defendant's negligence and their injuries.

**3.** Dr. Boyd has never stated that in his opinion exposure to creosote probably caused or contributed to Mr. Savage's basal cell cancer. Note the language in Dr. Boyd's letter quoted below is the test of this opinion. He states that it is his opinion "that exposure to the risk factors set out above [exposure to the sun, exposure to petroleum based products and tars (creosote) and cigarette smoking] caused or contributed to Mr. Savage's development of skin cancer." He does not specify which factor or factors might be involved and he doesn't say what type of "skin cancer." To get a better understanding of Dr. Boyd's opinion, note the following quotations from his deposition:

> Q. Now, in this case, let me ask you since we are on this particular point: is it your opinion that his potential exposure to oil, diesel, creosote, or other chemicals caused the basal cell carcinoma that was removed on his face?
> A. It is *possible.* (Emphasis added)

*See* Exhibit "A" to Def.'s Motion, p. 49.

> Q. On what we have marked as 1–C, material data safety sheets, I am looking to see if there are any highlights in here. On a document Bates stamped 001556 and you have highlighted "coal tar, creosote treated wood."

*Id.* at 503 (citations and quotation marks omitted). And, although the Plaintiff need not show "that the employer's negligence was the *sole* cause, there must be a sufficient showing (i.e., *more than a mere possibility*) that a causal relation existed." *Mayhew v. Bell S.S. Co.,* 917 F.2d 961, 963 (6th Cir.1990).

In light of the above, the Court believes its duty is clear. The Court must scrutinize the reasoning and methodology underlying Dr. Boyd's opinion that exposure to "petroleum products" was even a potential cause of the basal cell carcinoma that developed on Plaintiff's face in 1995.[3]

### D. Basal Cell Carcinoma

Basal cell carcinoma ("BCC") is a malignant, epithelial tumor of the skin that arises from the basal cells of the epidermis and its appendages. 1 *Dermatology in General Medicine* (Thomas B. Fitzpatrick, M.D., et al. Eds.). It is the most common form of skin cancer. *Id.* BCC is the most common tumor affecting light skinned indi-

> A. That was one of the substances that I recognized.
> Q. Okay. And is that significant, doctor, in your opinions with relation to this case?
> A. Well, creosote is certainly known to be a substance capable of causing squamous cell cancers.
> Q. What about basal cell?
> A. I would be suspicious that it is capable of doing the same thing but I cannot in my mind bring up reference or a citation that I could cite to substantiate that.

Exhibit "A", p.55.

> A. Clinically, basal cell carcinomas are much more common by a figure of five to one.

Exhibit "A", p. 24.

> A. Well, with basal cell carcinoma, the overwhelming majority are due to sun exposure or ultraviolet light exposure.

Exhibit "A", p. 25.

> Q. Would you agree that the development of basal cell carcinoma on his face which is the issue in this case is more consistent with exposure to the sun?
> A. Yes, sir.

Exhibit "A", P.63.

> Q. Is it more probable than not that the sun caused this basal cell carcinoma?
> A. Yes, sir.

Exhibit "A", p. 67.

viduals. *Id.* While the exact cause of BCC is unknown, exposure to sunlight has been implicated in predisposing persons to the development of BCC. *Id.* Arsenic exposure has also been linked to the development of BCC. *Id.*

### E. Dr. Boyd's Opinions

■ We start with the fundamental proposition that the existence of a causal connection between exposure to a certain chemical and an alleged injury requires specialized expert knowledge and testimony since such matters are not within the common knowledge of lay persons. *See Schmaltz v. Norfolk & Western Railway Co.*, 896 F.Supp. 180 (N.D.Ill.1995). Dr. Boyd formally expressed his expert opinions in this matter in a letter dated November 18, 1998 to Plaintiff's counsel. *See* Ex. B to Def.'s Motion to Exclude (hereinafter, "Def.'s Mot."). Dr. Boyd is a well-qualified, highly credentialed expert in the medical fields of dermatology and dermatopathology. He is knowledgeable, *inter alia*, in the diagnosis and treatment of skin cancers, but he is not an oncologist or a toxicologist. In the letter, Dr. Boyd stated that he had "reviewed the depositions of William R. McKiever, M.D. and Jerry D. Savage, the medical records of Jerry D. Savage, and the material safety data sheets for products used in the McGhee Arkansas shops." *Id.* Dr. Boyd further stated:

> From a review of these documents and what I know about the patient's workplace environment and personal habits it appears that he has had exposure to known risk factors for the development of skin cancer. Specifically,

these would include exposure to the sun (ultraviolet light), exposure to petroleum based products and tars (creosote) and cigarette smoking. He may also have some propensity to handle the sun poorly depending on his skin type. There does not appear to be an inherited tendency to skin cancer in this case. Skin cancer, particularly that of basal cell carcinoma and squamous cell carcinoma, tends to be a recurring disease.

> Based upon my education, training and experience as a physician specializing in the treatment of diseases of the skin, including skin cancer, it is my opinion that exposure to the risk factors set out above caused or contributed to Mr. Savage's development of skin cancer.

*Id.* Dr. Boyd further elaborated on his opinions in a deposition taken December 30, 1998. *See* Ex. A to Def.'s Motion.

Although the above passage references "petroleum based products" and "tars," Defendant contends that Dr. Boyd has limited his opinions to creosote.[4] Defendant points to the following testimony from Dr. Boyd's deposition:

Q. Okay. The exposure to petroleum based products indicates creosote?

A. Yes, sir.

Q. Any other petroleum based products that you know of that have caused or contributed to the development of skin cancer?

A. I cannot come up off the top of my head with their names but that information would be very easy to determine or define.

---

4. "Creosote" is defined as "a colorless or yellowish oily liquid that has a burning smoky taste, contains a mixture of phenolic compounds (as guaiacol),[and] is obtained by the distillation of wood tar...." *See* Webster's Third New Int'l Dictionary. "Creosote Oil" is "the part of the wood-tar distillate from which creosote is obtained by refining," and is "a yellowish to dark colored heavy oil that consists chiefly of liquid and solid aromatic hydrocarbons, tar acids, and tar bases, is obtained by distillation of coal tar, and is used as a preservative for wood, as an insecticide, and in ore flotation." *Id.*

Such dictionary definitions, while helpful, do not make clear the precise chemical composition of "creosote" generally, or of the particular type of creosote that was used to treat the cross-ties in the Plaintiff's workplace. Such precision is essential as a starting point for any scientific investigation of the possible role of such chemical(s) in causing the basal cell carcinoma found on Plaintiff's face in 1995.

Q. And you have not looked at that in this case?

A. I'm sorry I didn't.

Q. You haven't looked at any other types of petroleum products other than creosote that could potentially cause skin cancer in this case?

A. Are you talking about the products listed in the sheets. Is that correct?

Q. Yes.

A. No, sir.

Q. Okay. Do you intend to do that prior to trial in this case?

A. Probably not.

Q. Okay. If you do, would you advise Ms. Sanderson so that I can come back and ask you some questions about that?

A. Certainly.

*See* Ex. A to Def.'s Mot. at 55–60.[5] In his response Plaintiff fails to address this critical issue concerning Dr. Boyd's expert testimony. Plaintiff still contends that this case is about "toxic substances" including, "diesel fuel," "lube oil," "compressor oil," "benzene," "carbon black," "creosote," and "methylene chloride." *See* Plf.'s Response to Defendant's Motion to Exclude at 2–3 (hereinafter, "Plf.'s Resp."). However, the Court believes that Dr. Boyd's testimony quoted above is only susceptible to one interpretation: Dr. Boyd limited his inquiry as to the chemical causes of Plaintiff's basal cell carcinoma to creosote. Therefore, the presence of *any* other chemicals is completely irrelevant. Without expert testimony to link exposure to a chemical (e.g., benzene) to an effect (the development of basal cell carcinoma), Plaintiff cannot offer testimony that the particular chemical caused his cancer. This is blackletter law. The cause-effect paradigm involving exposure to toxic substances and cancer simply does not fall within the area of common knowledge or lay comprehension. By Dr. Boyd's own admission, he has not examined whether any chemical compound other than creosote could have

caused Plaintiff's cancer. Thus, his causation opinion shall be limited to creosote, and the Court will examine that opinion accordingly.

### E. Analysis

■ In order for the expert testimony to be "reliable," it must be based on the "methods and procedures of science," rather than on "subjective belief or unsupported speculation." *Kannankeril,* 128 F.3d at 806. A district court is not required to "admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

■ Defendant first contends that Dr. Boyd's causation opinion is flawed because he had no knowledge as to the amount of exposure Plaintiff had to creosote. Of course, knowledge of the extent of exposure to a potentially harmful substance is essential to any reliable expert opinion that the particular substance caused a disease. In order to carry the burden of proving a plaintiff's injury was caused by exposure to a specified substance, the plaintiff must demonstrate "the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure." *Wright v. Willamette Indus., Inc.,* 91 F.3d 1105, 1106 (8th Cir.1996). The existence of this requirement is not surprising. As one court has explained, "[t]he underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur." *Black v. Food Lion, Inc.,* 171 F.3d 308, 314 (5th Cir.1999). However, the evidence regarding exposure does not have to be "mathematically precise." *Wright,* 91 F.3d

---

5. Dr. Boyd has not supplemented his opinions since his deposition.

at 1107. The Fourth Circuit has cautioned that

> while precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.

*Westberry v. Gislaved Gummi AB,* 178 F.3d 257 (4th Cir.1999); see also, *Heller v. Shaw Industries,* 167 F.3d 146, 157 (3d Cir.1999)(noting "that even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness").[6]

With this backdrop in mind, the Court must examine what knowledge Dr. Boyd had of Plaintiff's exposure to creosote when he rendered his opinion that Plaintiff's cancer was caused by creosote. In his deposition, Dr. Boyd testified that "prolonged exposure" to petroleum products could be associated with the development of basal cell carcinoma. *See* Ex. A to Def.'s Mot. at 20. Dr. Boyd equated "prolonged exposure" with "years" of exposure. Id. at 21. Dr. Boyd further testified:

Q. Okay. What are we talking about when we talk about exposure?

A. My understanding is that we are talking about exposure to the chemical literally on the skin or a large volume of fumes to which the skin is exposed over a period of hours each day.

Q. Have you in preparation for testimony in this case discussed this matter at all with [Plaintiff]?

A. No, sir.

Q. Okay. Other than reviewing his deposition, you have not examined him or seen a picture of him?

A. No, sir.

*Id.* at 21.

Q. Do you have any knowledge as to the extent of his exposure to petroleum based products, in particular, creosote, while working for Union Pacific Railroad?

A. No, sir.

*Id.* at 60–61.

Q. Do you have any knowledge as to the extent of his exposure to any type of petroleum product, tar or creosote?

A. The extent?

Q. Yes sir.

A. I know that he was by virtue of his deposition and that what I read in the records provided to me, I know that he was exposed. The extent to which he was exposed, I don't know.

Q. Okay. So it may have been one day, three days, a week or a year? You just don't know?

A. From my understanding from reading the materials that were provided to me, that he was in a workplace environment around the materials that we have discussed on an everyday basis. I could be misreading the materials, but that is my understanding.

*Id.* at 63.

Q. Okay. Do you know the amount of these chemicals that were even there on the Union Pacific Property?

A. No, sir.

*Id.* at 65.

Dr. Boyd's testimony reveals the lack of reliability of his opinion that creosote caused or contributed to Plaintiff's cancer. Although Dr. Boyd knew that creosote was present due to the MSDS sheets and the Plaintiff's testimony, see Ex. D. to Def.'s

---

**6.** The more "relaxed" standards described above in *Westberry* and *Heller* appear to be in conflict with the Eighth Circuit's opinion in *Wright,* which seems to require hard evidence

of levels of exposure. However, it is the Court's opinion that the Plaintiff, Mr. Savage, has not even met the "relaxed" standards of *Westberry* and *Heller.*

Mot. at 34, and further knew that Plaintiff worked at the site from 1971 until 1997, see *id.* at 33, it appears that Dr. Boyd had no other information regarding Plaintiff's level of exposure to *creosote*. In fact, in his deposition, Plaintiff only spoke in generalities regarding his exposure to chemicals. He never specifically mentioned his level of exposure to creosote, and in fact, he focused the majority of his deposition testimony on exposure to diesel fuel. Plaintiff has, however, tendered an affidavit in support of his response to Defendant's motion. *See* Ex. B to Plf.'s Resp. In the affidavit, Plaintiff states that for the entire time he worked for the railroad, his work floor consisted of creosoted crossties. *Id.* ¶ 5. He further states that in performing his daily duties he had to "crawl on, lay on and be in contact with [the] creosoted ties on a daily basis for twenty years." *Id.* ¶ 6.

■ The issue here is not whether Plaintiff has enough evidence of exposure to reach the jury. The issue is whether Dr. Boyd's opinion is scientifically valid. An opinion is not scientifically valid when it is based upon wholly insufficient data. Thus, the Court questions whether any amount of "supplementation," by an affidavit of the Plaintiff, can render a deficient opinion reliable. Dr. Boyd did have knowledge that Plaintiff was exposed to creosote and he did have knowledge that Plaintiff was exposed to a number of other substances in his workplace, as evidenced by the MSDS sheets and Plaintiff's testimony. However, this is not enough under *Wright, supra.* Still, as noted in footnote 5 above, there are cases from other circuits which appear more lenient than *Wright* on both the exposure and causation issues.

These circumstances are similar to those presented to the Fourth Circuit in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir.1999). The expert in that case relied solely on a differential diagnosis to opine that the plaintiff's exposure to airborne talc caused the aggravation of a pre-existing sinus condition. The defen-

dant moved to exclude the opinion, alleging that the expert "had no means of assessing what level of exposure was adequate to produce the sinus irritation [plaintiff] experienced." *Id.* at 263. The court rejected the defendant's argument, stating:

> [A]lthough Dr. Isenhower did not point to a specific level of airborne talc, *there was evidence of a substantial exposure.* [Plaintiff] testified that he was exposed to very high levels of airborne talc throughout his workday. According to his testimony, when he removed the gaskets from the box in which they had been shipped, the gaskets, which were black, had so much talc on them that the appeared to be white or gray. And, talc was released into the air as the gaskets went through the cutting machines. [Plaintiff] testified that the talc that settled from the air around his work area was so thick that one could see footprint in it on the floor. He further stated that he worked in clouds of talc and that it covered him and his clothes. Moreover, at the close of his workday, [plaintiff] was required to blow off his work area and machinery with a blower, stirring up all of the talc that had fallen. *This testimony concerning the level of airborne talc was adequate to permit a factfinder to conclude that [Plaintiff] was exposed to high levels of airborne talc . . . .*

*Id.* at 264 (emphasis added).

Like the plaintiff in *Westberry*, has not the Plaintiff presented evidence of substantial exposure? After all, he stated that he crawled and lay on creosoted crossties for twenty years. But, in the context of the issues here, what, scientifically, constitutes "exposure"? There is sufficient evidence that Plaintiff was around and physically in touch with the creosote. In Dr. Boyd's view the Plaintiff had "prolonged exposure," indeed, "years" of exposure. But Plaintiff has produced no scientific data showing the *nature* of creosote exposure required to initiate or promote the development of basal cell carcinoma. Nor has he shown the *level* of

such exposure needed to cause such skin cancer in humans generally. Nor does he show with any degree of scientific reliability the level of his own exposure. In sum, Plaintiff has failed to present the fundamental information necessary to establish the scientific validity of Dr. Boyd's opinions. For this reason, Dr. Boyd's opinions with respect to creosote cannot meet the requirements of *Daubert.*

The recent case of *Mitchell v. Gencorp, Inc.,* 165 F.3d 778 (10th Cir.1999) relies on, and reinforces, the Eighth Circuit's strict view on this issue as found in *Wright,* in contrast to the more relaxed standard expressed in *Westberry.* In *Mitchell,* the plaintiff worked as a warehouseman and truck driver for a distribution company from 1988 until 1993. *Id.* at 779. In that capacity, he was required to "stock, organize, and fill orders from the company's 'flammable room.'" *Id.* This small room was alleged to have contained a number of barrels of toxic chemicals, including Toluene, Xylene, Hexane and Haptene. *Id.* The plaintiff allegedly entered the rooms several times per day. In 1992, the plaintiff was diagnosed with chronic myelogenous leukemia. *Id.* He subsequently brought suit against the chemical manufacturer. *Id.* In 1995, the plaintiff died, and his executor and other family members pursued the lawsuit. *Id.*

At trial, the Plaintiffs sought to introduce testimony from five expert witnesses. One of the experts, Steve Herron, sought to testify that plaintiff's exposure to the defendant's products caused him to develop chronic myelogenous leukemia. In reaching such a conclusion, Herron relied solely upon his study of photographs of the "flammable room" and MSDS sheets listing the chemicals contained in the defendant's products. Herron never visited the flammable room and did not conduct any tests of the air to determine the levels of chemicals present.

Not surprisingly, the district court excluded Herron's opinions under Fed. R.Evid. 702 and *Daubert.* On appeal the Tenth Circuit affirmed. The Court began its analysis by noting the standard set forth in *Wright,* that a plaintiff must demonstrate the level of exposure to a toxic substance that is hazardous to human beings, as well as the plaintiff's actual level of exposure to the substance. *See Mitchell,* 165 F.3d at 781, *citing Wright,* 91 F.3d at 1106. The Court then addressed the evidence the plaintiff presented to meet this standard:

> The record demonstrates that Plaintiffs attempted to establish Mitchell's level of exposure in two ways. First, Plaintiffs attempted to establish Mitchell's level of exposure through his own statements describing the number and length of visits he made to the "flammable room." Second, Plaintiffs attempted to set the level of exposure through Steve Herron, an industrial hygienist, who after studying material safety data sheets and pictures showing some chemical spillage, opined that Mitchell's exposure to Defendant's products caused him to develop myelogenous leukemia. These attempts fall short.
>
> While Mitchell's testimony could be relevant to proving that the "flammable room" contained chemicals, it does not clarify the level of chemicals to which Mitchell was exposed. Similarly, the materials relied upon by Herron are not relevant in determining the level of exposure. It makes little sense to argue that a scientist can look at pictures and a list of chemicals contained in a room and arrive at a level of exposure. Moreover, Herron himself testified that there was no occupational exposure data.
>
> We believe a plaintiff must prove the level of the exposure using techniques subject to objective, independent validation in the scientific community. *See Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir.1998)(en banc). At a minimum, the expert should include a description of the method used to arrive at the level of exposure and scientific data supporting the determination. The expert's assurance that the method-

1035

ology and supporting data is reliable will not suffice. *Id.* "Scientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Allen*, 102 F.3d at 199. Absent supporting scientific data, Mitchell's estimates and Herron's conclusions are little more than guesswork. Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case.

*Mitchell*, 165 F.3d at 781.

The facts of the present case are not materially different from those presented to the Tenth Circuit in *Mitchell*. Dr. Boyd reached his conclusion regarding the cause of Plaintiff's basal cell carcinoma by looking at material safety data sheets, reading plaintiff's deposition and examining Plaintiff's medical records. Dr. Boyd did not visit the McGhee facility, nor did he perform any tests to determine what level of chemicals were present at the facility, either on the surfaces (such as the surfaces of the cross-ties) or suspended in the air.[7] Dr. Boyd candidly admitted that he did not know the extent of Plaintiff's exposure and that he did not know the amount of "chemicals" present on the property.[8] Moreover, at the time Dr. Boyd reached his conclusion, Plaintiff had not even indicated that he was exposed to creosote. Dr. Boyd merely knew that creosote was present because of the material safety data sheets. Beyond that, Dr. Boyd failed to present any scientific data demonstrating the level of exposure necessary to produce this type of cancer in human beings. He likewise failed to present any evidence regarding the exposure mechanism necessary to produce such cancer. In sum, Dr. Boyd's conclusion as to the cause of Plaintiff's basal cell carcinoma is nothing more than an "educated guess" with no scientific data to support it. The opinion fails to

meet the requirements of *Daubert* and Fed. R. Evid 702.

And, it should be noted, that the above discussion presupposes the reliability of Dr. Boyd's opinion that exposure to creosote can cause basal cell carcinoma. With respect to this issue, Defendant argues that Dr. Boyd's opinion is unreliable because he fails to provide any causal connection between exposure to creosote and the development of basal cell carcinoma.

Again, the Court has reviewed Dr. Boyd's deposition to identify the scientific methods he has used to link exposure to creosote to the development of basal cell carcinoma. This review has produced several items of interest. First, it is clear that Dr. Boyd has relied very little on scientific literature to support his conclusion. This fact is highlighted by several portions of Dr. Boyd's deposition:

Q. Okay. On page 14 [of Dr. McKiever's deposition], it is highlighted, "Are you familiar with any articles with respect to petroleum products causing skin cancer, specifically." And that is highlighted. Why is that highlighted doctor?

A. Again because of the nature of the case and because of the answer that followed which I believe is several lines down. He said that he could not recall a specific article. I am familiar with some articles that support that point.

Q. Okay. Where are those articles located, Doctor?

A. They are located in the scientific literature almost surely in the cancer literature or the dermatology literature.

Q. Have you done any search in relation to similar articles dealing with

---

7. In his deposition, Dr. Boyd, in addressing the exposure issue, stated, "My understanding is that we are talking about either exposure to the chemical literally on the skin or a large volume of fumes to which the skin is exposed over a period of hours each day." Exhibit "A", pp. 20–22.

8. *See* discussion and deposition excerpts, pp. 16–17, *supra.*

petroleum products causing cancer for this case?

A. I looked up a reference in a book chapter table which was present in the chapter. In terms of actually getting on Med–Line of Grateful Med and trying to find them, no.

Q. What book, Doctor, and chapter if you recall?

A. The book is, I believe, the text Dermatology in General Medicine edited by Thomas Fitzpatrick, the chapter was Squamous Cell Carcinoma. The lead author was Thomas A. Swartz of New Jersey.

Q. And what was discussed in that chapter with regard to petroleum products and skin cancer specifically?

A. There was several. There was a subsection involving contact with hydrocarbons and the date of their description in the medical literature with these citations for those descriptions.

Q. What was the conclusion with respect to petroleum products having any effect on the cause of skin cancer?

A. That there is an association between contact with hydrocarbon products and the subsequent development of subcutaneous squamous carcinoma.

Q. Okay, now is the same true of basal cell carcinoma?

A. I did not specifically search that. I am reasonably certain that the same risk factors, with some exceptions, apply to basal cell carcinomas as to squamous cell carcinoma and that prolonged exposure to petroleum products would also be associated with the development of basal cell carcinoma, *but that question could be very easily answered.*

*See* Ex. A at 18–20. Unfortunately for Plaintiff, that question has never been answered, neither in Dr. Boyd's deposition nor in the materials submitted in response to Defendant's motion. In fact, with re-spect to creosote, Dr. Boyd directly contradicted his opinion that hydrocarbons can cause basal cell carcinoma:

A. Well, creosote is certainly known to be a substance capable of causing squamous cell cancers.

Q. What about basal cell?

A. I would be suspicious that it is capable of doing the same thing but I cannot bring up a reference or a citation that I could cite to substantiate that.

*Id.* at 55. The above testimony essentially forecloses the admissibility of Dr. Boyd's opinion. Dr. Boyd limited his inquiry as to the cause of Plaintiff's basal cell carcinoma to creosote. He then testified that he was "suspicious" that creosote in particular could cause basal cell carcinoma. To be sure, Plaintiff has submitted a number of articles dealing with exposure to hydrocarbons and skin cancer in general. However, these articles are of little use because they do not deal with the specific situation presented here. One simply cannot assume that just because a substance causes a particular kind of cancer, that it will cause another type. There has to be some sort of scientific evidence linking the particular cause and the particular effect, and, as described above, that evidence is lacking in this case.

The only article cited by Dr. Boyd that even comes close to supporting his opinion is found in his affidavit in support of Plaintiff's response to Defendant's motion to exclude. The article is titled "Multiple Pigmented Papular Basal Cell Carcinomas: a New Pattern of Industrial Tar Induced Skin Tumors," British Journal of Indust. Med 1986; 43:134–36. The article documents the occurrence of small papular basal cell carcinomas on the face of a 62–year old man. The article never mentioned exposure to creosote *per se,* but did note that the man "had been working on open coke ovens since the age of 17." *Id.* at 134. He was also "exposed to vaporizing gas" and worked for 12 years in a plant making benzol. Eventually the man was employed

in job where he was "directly in contact with light oils and benzol as well as with tar acids." *Id.* Although the man presented with numerous basal cell carcinomas on his face, the article noted that the presence of this type of tumor, and its location, was "surprising." *Id.* at 135. According to the article, "[t]he skin tumors induced by tar have usually been squamous cell carcinomas that have developed from tar keratoses, but multiple keratoacanthomas have also been described. Basal cell carcinomas are uncommon and if discovered usually present as a solitary lesion." *Id.* at 134 (citations omitted).

Clearly, this article is insufficient to render Dr. Boyd's opinion admissible under *Daubert*. First, the article itself does not purport to document the *cause* of the man's skin cancer. Rather, it merely notes the somewhat odd occurrence of basal cell carcinoma in a person with prolonged exposure to risk factors normally associated with other types of skin cancer, such as squamous cell carcinoma and keratoacanthoma. Furthermore, the text of the article itself never mentions exposure to creosote. The article does note exposure to a wide variety of coal by-products, but again, exposure to coal products in general is an altogether different issue than the limited issue of exposure to creosote. In sum, this article is only tangentially related to the question before the Court, and it certainly cannot establish the admissibility of Dr. Boyd's opinion that Plaintiff's basal cell carcinoma was caused by exposure to creosote.

In his deposition, Dr. Boyd also cited a text titled "Dermatology in General Medicine." In Chapter 70, titled "Carcinogenesis: Chemical," the text lists a table of chemicals associated with the development of skin cancer. 1 *Dermatology in General Medicine,* Table 70–1 (Thomas B. Fitzpatrick, M.D., *et al.* Eds.). Table 70–1 does not list any correlation to exposure to coal products and basal cell carcinoma. For "coal tar" and "pitch" the table lists the "rout of exposure" as squamous cell carcinoma. *Id.* The text also contains a chapter on basal cell carcinoma. *See Id.,*

Chap. 75. Nowhere in that chapter is there a reference to exposure to creosote (or for that matter any other hydrocarbons) causing basal cell carcinoma.

The text does have a couple of references which tangentially support Plaintiff's position. First, Table 70–2 indicates that application of polycyclic aromatic hydrocarbons yields, among many other types of cancers, basal cell carcinomas in rats and Syrian hamsters. *Id.* It appears to be undisputed that creosote contains polycyclic aromatic hydrocarbons. Second, Chapter 141, titled "Occupational Dermatomes and Disorders Due to Chemical Agents" contains a subsection on Polycyclic Aromatic Hydrocarbons. The text states: "Polycyclic aromatic hydrocarbons have accounted for most of the occupational skin tumors. These chemicals are contracted from the following sources: (1) tar, creosote, anthracene oil ..." *Id.* The text goes on to indicate that basal cell carcinoma can be caused by exposure to polycyclic aromatic hydrocarbons. Notably, these sections referring to exposure to polycyclic aromatic hydrocarbons are grouping together entire classes of chemicals, including oils, waxes, tars and greases.

Again, the *Mitchell* case from the Tenth Circuit is instructive. In that case, the plaintiff argued that the chemicals he was exposed to were chemically similar to benzene, which is known to cause a certain type of leukemia. *Mitchell,* 165 F.3d at 782. The plaintiff thus argued that the chemicals caused his leukemia, which was of a different type. The Tenth Circuit agreed with the district court that the opinions lacked sufficient scientific validation. *Id.* The Court noted that the plaintiff failed to present concrete, scientific evidence regarding the similarities of the chemicals and also failed to present scientific evidence demonstrating how the different chemicals will cause the same response in the human body. *Id.* The Court concluded: "Without scientific data supporting [the experts'] conclusions that chemicals similar to benzene cause the

same problems as benzene, the analytical gap in the experts' testimony is too wide for the opinions to establish causation." *Id.*

The circumstances in the present case are similar to those in *Mitchell,* although the disparities are even more pronounced. First, there is an obvious lack of scientific data linking creosote exposure to basal cell carcinoma. While Plaintiff does have a fair amount of data indicating that exposure to polycyclic aromatic hydrocarbons can cause squamous cell carcinoma, there is no reliable scientific data or testimony to "bridge the gap" between the two types of cancers. Even Dr. Boyd admitted that he was "skeptical" that the chemicals could cause basal cell carcinoma. Second, and even more problematic, is the loose manner in which plaintiff and Dr. Boyd refer to the chemicals to which Plaintiff was allegedly exposed. "Creosote" is lay term used to refer to a tar distillate. Dr. Boyd has not provided any testimony as to the specific carcinogenic substance or substances found in creosote, other than to say that it contains "polycyclic aromatic hydrocarbons." [9] Similarly, Dr. Boyd has not tested the creosote to which Plaintiff was exposed to determine its chemical composition. *Daubert* demands more specificity and independent evaluation from an expert seeking to testify as to the chemical cause of a particular cancer.

Considering the evidence as a whole, the Court finds that Plaintiff has failed to present any scientifically reliable evidence that exposure to creosote causes basal cell carcinoma. The vast majority of references cited by Plaintiff do not even mention such a causative link. Furthermore, the references supporting Plaintiff's position only demonstrate that a broad class of chemicals can "possibly" cause basal cell

carcinomas. They are never specifically aimed at the effects of creosote exposure. In sum, there is nothing to connect the Plaintiff's exposure to creosote to the development of basal cell carcinoma other than the unsupported assertion of Dr. Boyd. And, as previously noted, even Dr. Boyd expressed doubt as to whether creosote could cause basal cell carcinoma. Accordingly, the Court finds that Dr. Boyd's opinion, as proffered, is not scientifically reliable, and is therefore not admissible under *Daubert* or the Federal Rules of Evidence. Defendant's motion to exclude will be granted.

### F. Dr. William McKiever

 Plaintiff indicated in his response to Defendant's motion that he also intends to use the testimony of his general practitioner, Dr. William McKiever, to establish that his basal cell carcinoma was caused by exposure to "petroleum products." However, a review of Dr. McKiever's deposition clearly establishes that Dr. McKiever's causation opinion cannot withstand *Daubert* scrutiny. The following excerpt of Dr. McKiever's deposition is revealing:

Q. Okay. I'm looking at your record of February 2, 1995, when [plaintiff] came in with a lesion on the left side of his face, and is there any history with regard to the cause of that particular lesion, Doctor?

A. No.

Q. Did you make any determination later as to when Mr. Savage was exposed to whatever irritant that may have caused the skin lesion that you removed from his face in February of 1995?

A. Did I make a determination of what the cause was?

---

9. Dr. Boyd's opinion is analogous to an expert saying "cigarette smoke causes cancer"—and then providing no other explanation. While such a statement may be true, it is, taken alone, so lacking in any scientific specificity that it is utterly meaningless. Cigarette smoke contains many different chemicals, some of which have been implicated in

the cancer disease process. Presumably "creosote" contains many such chemicals as well. Given the rudimentary nature of Dr. Boyd's opinions, one is simply left to speculate as to what in "creosote" makes it carcinogenic and, if it is, what the mechanism of that carcinogenesis is.

Q. Yes, sir. In February of 1995.

A. No, sir.

Q. Do you know when Mr. Savage was exposed to any particular irritant that would have caused that lesion on his face in February of '95?

A. Do I know when he would have?

Q. Yes, sir. What time frame we're talking about that would have caused that-

A. About how long he's worked for the railroad and that sort of thing, or anything?

Q. Just anything in general.

A. I just knew that he worked for the railroad, and he worked outside, and he worked in chemicals, and as far as a lot of grease products and that sort of thing, too, because most of the time, when he came in, he had on his work clothes.

*See* Dep. of Dr. William McKiever at 15–16. Dr. McKiever admitted that he could not recall any specific articles establishing petroleum products as a cause of skin cancer. *Id.* at 14.

Dr. McKiever's deposition demonstrates that he has no scientifically valid opinion that creosote caused or contributed to Plaintiff's basal cell carcinoma. Dr. McKiever has made the broad inferential leap that the exposure to "grease products" caused Plaintiff's cancer, without providing *any* scientific data, analysis, or research to support such a conclusion. This type of *ipse dixit* opinion is precisely the type of opinion that fails the *Daubert* inquiry. Accordingly, the Court will not allow Dr. McKiever to testify as to the chemical causes of Plaintiff's skin cancer.

## III. Conclusion

The Plaintiff has failed to meet his burden of showing that the causation testimony of his experts meets the standards of admissibility established in *Daubert.*

One final observation: Where there is no reliable, *direct,* scientific knowledge that a particular substance causes a particular form of cancer in humans, *Daubert* will not necessarily defeat plaintiffs' claims. But the scientific reliability standard of *Daubert* remains. In *National Bank of Commerce v. Dow Chemical Co.,* 965 F.Supp. 1490, 1507–1509 (E.D.Ark. 1996), this Court discussed, *inter alia,* the following scientifically based alternatives: (1) Structure-activity relationship; (2) In vitro studies; (3) Animal studies; (4) Epidemiological studies; and (5) Secular trend data. Here, however, the Plaintiff has produced no such scientific alternatives to support his causation contentions.

Significantly absent here are any epidemiological studies supporting the plaintiffs' theory that creosote can and does cause basal cell carcinoma in humans. Ordinarily when such a hypothesis is put forward, the investigator immediately looks for studies of population groups most exposed to the suspect chemical. Here, for instance, one would search for studies of workers engaged in the manufacture of creosote and of workers engaged in the application and daily use of creosote (such as in the creosoting of railroad cross ties). One would want to determine if the instance of the particular effect (such as basal cell carcinomas) was greater in populations continuously exposed to creosote than in populations not so exposed. But we have no such studies here. We do not even have information showing that those who worked in the same location as Mr. Savage, the Plaintiff here, had a greater instance of basal cell carcinoma than unexposed populations.

When courts are presented with *Daubert* issues, they must deal with same on the record submitted by the parties. Here, for instance, the plaintiff alleges that he was subjected to and exposed to a "toxic soup" of, *inter alia,* benzene, diesel fuel, lube oil, compressor oil, carbon black, furnace oil, car journal oil, methylene chloride, and creosote. But, when the issue was submitted, the plaintiff limited himself to the contention that his basal cell carcinoma was caused by a combination of overexposure to sunlight and exposure to

**1040**

creosote. There is in the record ample scientific support for sun-exposure being responsible for Plaintiff's basal cell carcinoma. There is no such support for his contention that creosote was a contributing cause. The latter was the issue presented and the only one resolved by this opinion.

IT IS THEREFORE ORDERED that after the Motion to Preclude Plaintiff's Expert, Dr. Alan Boyd from testifying that the creosote at Plaintiff's workplace caused or contributed to his basal cell carcinoma be, and it is hereby, GRANTED.[10] The Court also hereby excludes the testimony of Dr. William McKiever to the extent Plaintiff intends to offer his testimony as to any chemical cause of Plaintiff's basal cell carcinoma.