No. 12-1135 *Harris v. CSX Transportation, Inc. et al.*

**FILED**

**November 13, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, Justice, dissenting:

In reaching its decision that the trial court erred in excluding the petitioner's expert witnesses, the majority utterly failed to appreciate the following observation made in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995) ("*Daubert* II"): "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive. . . ." *Id.* at 1315-16. And, as the Ninth Circuit explained in *Daubert* II, "the expert's bald assurance of validity is not enough." *Id.* at 1316. To demonstrate that the "expert's findings are based on sound science, . . . some objective, independent validation of the expert's methodology" is required. *Id.* Complying with its pivotal role as a gatekeeper, the trial court carefully and thoroughly reviewed the conclusions reached by the petitioner's three expert witnesses and concluded their opinions were not grounded on scientifically valid and properly applied methodology. Given the trial court's unassailable analysis, the majority unequivocally overstepped its authority in reversing a decision wholly subject to the trial court's discretion. *See Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("*We hold, therefore, that abuse of discretion is the proper standard by which to review a . . . [trial] court's decision to admit or exclude scientific evidence.*")

1

(emphasis supplied).

The overarching purpose of the trial court's gatekeeping role is largely eviscerated by the majority's decision to resort to the threadbare touchstone of "admissibility versus weight of the evidence." Reliance on this prosaic evidentiary yardstick is both shortsighted and demonstrably imprudent. Rather than erring on the side of admissibility and forcing the jury to sort out the experts' opinions, the preferred outcome is to allow the trial court, as it did in this case, to perform the critical evaluations inherent to and required by the *Daubert*/*Wilt* gatekeeping function.[1] And when the trial court properly performs its role, an appellate court should respect the decision reached, barring a clear abuse of its discretion. Finding no clear abuse of discretion on the facts of this case, I must respectfully dissent from the majority's decision.

**Standard of Review**

In declaring the applicable standard of review to be *de novo* in this case, the majority completely misapprehends both what this Court has previously recognized as the governing standard that controls these *evidentiary* rulings as well as the proper scope of its review of the trial court's ruling. In explaining the scope of appellate review of *Daubert*

---

[1]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993); *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993).

2

gatekeeping rulings, Justice Cleckley expounded in *Gentry v. Magnum*, 195 W.Va. 512, 466 S.E.2d 171 (1995):

> In applying the standard of review that we adopted in *Beard* and in cases other than those resulting in summary judgment, *we have held a circuit court has broad discretion in determining the relevancy of scientific evidence and this Court will sustain the circuit court's ruling unless the ruling is a clear abuse of discretion.* On the other hand, our review of the granting of summary judgment and of a *circuit court's determination regarding whether the scientific evidence was properly the subject of "scientific, technical, or other specialized knowledge" is de novo."*

*Id.* at 519, 466 S.E.2d at 178 (emphasis supplied).

In those cases where the parties dispute whether the evidence is subject to the *Daubert*/*Wilt* principles, there is no question that this Court applies a *de novo* review to resolve the question of law presented and to ascertain that the correct standard was applied. *See San Francisco v. Wendy's Int'l, Inc.*, 221 W.Va. 734, 740, 656 S.E.2d 485, 491 (2007) (stating that *de novo* review is required to determine whether trial court applied proper standards under *Daubert/Wilt* in deciding whether to admit or exclude expert testimony and to ascertain whether the expert evidence was "scientific, technical, or otherwise specialized knowledge") (quoting *Gentry*, 195 W.Va. at 515, 466 at 174, syl. pt. 3, in part). In this case, there was no dispute as to the expert testimony being subject to the well-established gatekeeping principles as the parties concurred regarding the use of these standards. The record of this case makes clear that the trial court performed its duties of assessing the

3

expert's proposed testimony for purposes of reliability and relevance. *See* Syl. Pt. 2, *Wilt*, 191 W.Va. 39, 443 S.E.2d 196. As a result, the respondent CSX correctly argued that the trial court's determination, upon application of the *Daubert/Wilt* gatekeeper analysis, was reversible *only* upon an abuse of discretion.

Other courts agree that "[w]e review de novo the question of whether the [trial] court applied the proper standard and actually performed its gatekeeper role in the first instance." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003); *accord Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (stating that '[i]f the district court properly applied the *Daubert* framework, we then review the district court's ultimate decision to admit or to exclude the testimony for an abuse of discretion"). As the Kentucky Supreme Court sagely explained, an appellate court is not supposed to duplicate the gatekeeping analysis already performed by the trial court:

> The decisions of trial courts as to the admissibility of expert witness testimony under *Daubert* are generally entitled to deference on appeal because trial courts are in the best position to evaluate first hand the proposed evidence. As such, when an appellate court subsequently reviews the trial court's *Daubert* ruling, it must apply the "abuse of discretion standard."

*Miller v. Eldridge*, 146 S.W.3d 909, 914 (Ky. 2004). What is subject to *de novo* review is not the individual findings reached, but instead the "court's application of the *Daubert* framework, i.e., whether the [trial] court assessed the reliability and relevance of the

4

proffered testimony." *Bartlett*, 487 F.3d at 489.

In looking solely to unsupported *dicta* in *Wendy's International* as the basis for its *de novo* reviewing standard, the majority not only fails to appreciate the standard that Justice Cleckley articulated and this Court adopted, but also, after taking the bait set by former Justice Starcher in *Wendy's International*, wholly blurs the distinction between appellate review that is decidedly limited to recognizing that the proper standard was applied and a wholesale reapplication of that gatekeeping standard on appeal.[2] Through its patent failure to examine the underpinnings of the standard of review for *Daubert/Wilt* cases at length, the majority misconstrued the critical limitations on appellate review of these rulings.

Moreover, the majority went seriously astray in this case by wrongly injecting itself into a matter clearly reserved for the trial court's discretion. When it suits the author of the majority, that justice subscribes to the following standard: "Under abuse of discretion review, we do not substitute our judgment for the circuit court's." *State v. Taylor*, 215 W.Va. 74, 83, 593 S.E.2d 645, 654 (2004) (Davis, J., dissenting). By erroneously declaring the standard of review to be plenary with regard to the trial court's decision on the admissibility

---

[2]The irony cannot be missed that in criticizing the circuit court for conducting a "mini trial"–exactly what is required under *Daubert/Wilt*–the majority simply chose to conduct its own "mini trial"–for the express purpose of reaching a conclusion different than that reached by the trial court.

5

of the expert testimony, the majority wholly "disregard[ed] the limited nature of our review."

*Id.*

**Exclusion of Expert Witnesses**

At the center of the trial court's decision that the conclusions reached by the plaintiff's expert witnesses were not reliable was its related determination that the respective opinions of the three experts were not grounded on a scientifically valid and properly applied methodology. In reaching that decision, the trial court, after reviewing the proffered testimony of each of the three experts, ruled that there was inadequate evidence that the opinions and conclusions of Drs. Infante, Goldstein, and Durie had been tested or subjected to peer review and publication. An additional flaw that the trial court recognized was the failure of those opinions to have an actual or potential known error rate. These grounds are the exact grounds articulated initially by the United States Supreme Court in *Daubert* and later by this Court in *Wilt,* and its progeny, as a basis for rejecting proffered expert testimony concerning "scientific, technical, or other specialized knowledge." W.Va.R.Evid. 702; *see Daubert,* 509 U.S. at 593-94; *Wilt*, 191 W.Va. at 46, 443 S.E.2d at 203.

What the petitioner seeks to prove through her experts is that exposure to diesel exhaust fumes causes a specific type of cancer–multiple myeloma. And, yet, not one of the three experts Ms. Harris selected proffered any valid scientific evidence that diesel exhaust

6

exposure causes multiple myeloma.[3]  This failure to make the necessary causal connection between diesel fume exposure and multiple myeloma, as the trial court correctly reasoned, is critical.  *See Richardson v. Union Pacific R.R. Co.*, 386 S.W.3d 77, 80 (Ark. Ct. App. 2011) (recognizing that toxic tort plaintiff is required to prove both general and specific causation);[4] *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999) ("The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur.").  A summary of the deficiencies the trial court found with regard to each of the three experts upon examination of their proffered testimony follows.

**Dr. Infante**

Dr. Infante, an occupational environmental epidemiologist, testified that his methodology consisted of evaluating both animal studies and literature concerning selected

---

[3]Dr. Durie was the only one that testified that diesel exhaust causes multiple myeloma. Because his own research efforts had not resulted in that finding, however, his conclusion was of questionable value.  *See Daubert* II:  "One very significant factor to be considered [in assessing scientific reliability] is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."  43 F.3d at 1317.

[4]"General causation addresses whether a particular agent can cause a particular illness. Specific causation addresses whether that agent in fact caused the particular plaintiff's illness."  *Richardson*, 386 S.W.3d at 80 (citations omitted).

constituents of diesel exhaust, including benzene and pristane. The trial court related that Dr. Infante had relied upon a meta-analysis referred to as "Sonoda 2001," in reaching his conclusion that there was a potential for diesel exhaust exposure to be associated with an elevated risk of multiple myeloma. "Dr. Infante testified on direct examination that Sonoda 2001 considered 8 case-control studies specific to engine exhaust and stated it concluded that diesel and non-diesel engine exhaust causes multiple myeloma." Yet, as the trial court found, "[o]n cross examination Dr. Infante acknowledged that none of the 8 papers included in the Sonoda meta-analysis mention diesel exhaust." In this same fashion, the trial court dissected another study he relied upon (IARC Technical Publication Number 42) as well as Dr. Infante's own meta-analysis. The trial court found that, rather than expressing a judgment as to diesel exhaust causing multiple myeloma, Publication 42 merely cited a single paper and declared an agenda for future research. Many of the papers Dr. Infante relied upon in conducting his own meta-analysis do not even mention diesel exhaust. Of further import to the trial court was the fact that Dr. Infante excluded Boffetta 2001, a seminal study conducted in Sweden that involved millions of people specifically directed at examining the possible effects of diesel exhaust on various occupations including railroad workers–the specific occupation of Mr. Harris. That study reached the conclusion that diesel exhaust exposure was statistically insignificant in causing multiple myeloma.[5]

---

[5]865 diesel exposed men developed multiple myeloma compared to 860 non-diesel exposed men.

In deciding that "Dr. Infante did not meet the demands of good science," the trial court considered his failure to include the Boffetta 2001 in his study and his lack of familiarity with the EPA Health Assessment document specifically targeted at diesel engine exhaust.[6] As the trial court properly opined, "[i]t is not appropriate in a good scientific causation methodology to ignore or be willfully unaware of contrary evidence." The trial court concluded that Dr. Infante "limited his opinion [to] an expression of 'association' between diesel exhaust and multiple myeloma" and "did not express an opinion that diesel exhaust causes multiple myeloma." After recognizing the lack of testing, peer review, or publication of Dr. Infante's scientific opinions and conclusions, the trial court determined that "his opinions are little more than rank speculation or imagination."

**Dr. Goldstein**

After disclosing the fact that Dr. Goldstein's "sole source of income is litigation consulting,"[7] the trial court addressed the constrained nature of his testimony. In concluding that his opinions had not been subject to peer review, testing, or publication, the trial court found:

---

[6]That assessment evaluated all 29 rodent studies conducted on inhaled diesel exhaust and determined that none of them resulted in a conclusion that diesel exhaust causes multiple myeloma.

[7]As the Court commented in *Daubert* II, "in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." 43 F.3d at 1317.

Dr. Goldstein restricted his evaluation to that pertaining only to the "biologic plausibility" of the subject hypothesis. He further restricted himself to the consideration of animal studies, studies which are not suited to determining the "biologic plausibility" of the subject hypothesis as there exists no relevant animal model. *He was unable to cite any specific studies supporting his specific opinions regarding diesel exhaust, its constituents and their purported ability to cause multiple myeloma in humans.* Moreover, he testified to an awareness that organizations such as IARC and U.S. EPA have not concluded that diesel exhaust causes multiple myeloma in humans. (emphasis supplied)

Upon examination, the trial court concluded that Dr. Goldstein's paid opinion simply lacked the necessary foundation of scientific reliability.

**Dr. Durie**

Dr. Durie, a physician certified in internal medicine, hematology, and oncology, testified that diesel exhaust causes multiple myeloma. In reaching this conclusion, he relied on the opinion of Dr. Infante with regard to the epidemiologic literature as well as his own clinical experience. While Dr. Durie authored one causation paper entitled "The Epidemiology of Multiple Myeloma," that paper does not even mention diesel exhaust. As the trial court noted, Dr. Durie was impeached on the absence of diesel exhaust fumes as an identified cause for multiple myeloma on the website for the International Myeloma Foundation–an organization for which he serves as chairman.

Of the three experts offered by the petitioner, Dr. Durie was the only one who

10

actually testified that diesel exhaust causes multiple myeloma. In terms of scientific validity, however, his testimony was clearly the weakest evidence proffered by the petitioner. In concluding that Dr. Durie's opinion lacked the predicate requisites of reliability, the trial court reasoned:

> Dr. Durie testified to the requirements of "good science" but did not employ them in supporting his opinion that diesel exhaust causes multiple myeloma. He relied on the literature review of Peter Infante who himself did not employ a methodology grounded in good science. Despite Dr. Durie's opinion testimony that diesel exhaust causes multiple myeloma, he has not expressed this causation opinion in his own published writing on the causes of multiple myeloma, nor has the International Myeloma Foundation, an organization of which he is chairman. Dr. Durie's opinions about the causes of multiple myeloma are largely unsupported by citations to relevant scientific literature.

Not only does a trial court have the discretion to exclude an expert from presenting an opinion that is not sufficiently tied to reliable data, but "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* . . . mandates the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l RR Passenger Co.*, 303 F.3d 256, 266 (2d Cir. 2002). As Justice Cleckley explained in *Gentry*, "'nothing in the Rules [of Evidence] appears to have been intended to permit experts to speculate in fashions unsupported by . . . the uncontroverted evidence.'" 195 W.Va. at 527, 466 S.E.2d at 186 (quoting *Newman v. Hy-Way Heat Systems, Inc.*, 789 F.2d 269, 270 (4th Cir. 1986)). Critically, neither the petitioner

11

nor the majority ever directly addressed the exigent flaws identified by the trial court with regard to the proffered expert testimony.

By viewing this case as one where the trial court wrongly focused on the conclusions reached by the experts, the majority misapprehends the interwoven nature of the methodologies and conclusions. Rejecting the argument that the conclusions reached by an expert should never be the focus of a *Daubert* inquiry, the United States Supreme Court cogently explained in *Joiner*:

> *But conclusions and methodology are not entirely distinct from one another.* Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.* That is what the District Court did here, and we hold that it did not abuse its discretion in so doing.

522 U.S. at 146 (citation omitted and emphasis supplied). In this case, as in any toxic tort case, the plaintiff must establish the causal connectivity of the chemical component to the particular disease or injury. *See King v. Burlington N. Santa Fe Ry. Co.,* 762 N.W.2d 24, 34 (Neb. 2009); *Richardson*, 386 S.W.3d at 80. As a result, the need for expert testimony to supply that critical causal connection is often the key to a plaintiff's toxic tort

12

case–especially, as in cases such as this, where general causation has yet to be established.[8]

Inexplicably, the majority altogether failed to address two of the assignments of error that were raised in this case. The omitted issues concerned the question of whether there is a reduced standard for the admissibility of expert opinions in FELA cases and whether general causation must be proved in a toxic tort case before a FELA plaintiff's expert can testify as to specific causation. In castigating the trial court for its focus on "right or wrong," what the majority failed to comprehend is that the substantive law that applies to FELA cases requires a showing of general causation before proceeding to the issue of specific causation. *See King,* 762 N.W.2d at 34; *Richardson*, 386 S.W.3d at 80. This is nothing new. Apparently, the majority sought to brush this critical legal component of a FELA case under the rug by failing to discuss this assignment of error and the corresponding focus of the trial court's analysis in light of this requirement of general causation.

Upon reflection, I am left with the firm opinion that the majority has failed to comprehend the import of the *Daubert*/*Wilt* standard. Experts are not permitted to "hide" behind psuedoscience and studies as the United States Supreme Court made clear in *Joiner*. In upholding the district court's decision to refuse to admit plaintiff's experts because they had failed to show a link between exposure to PCB's and small-cell lung cancer,[9] the high

---

[8]*See supra* note 4.

[9]The trial court believed that the expert testimony at issue "did not rise above
(continued...)

13

court did exactly what the majority faults the trial court for doing in this case: looked behind the experts' opinions to determine whether the cited studies were in fact supportive of the conclusions reached.

> The District Court agreed with petitioners that the animal studies on which respondent's experts relied did not support his contention that exposure to PCB's had contributed to his cancer. The studies involved infant mice that had developed cancer after being exposed to PCB's. The infant mice in the studies had had massive doses of PCB's injected directly into their peritoneums or stomachs. Joiner was an adult human being whose alleged exposure to PCB's was far less than the exposure in the animal studies. The PCB's were injected into the mice in a highly concentrated form. The fluid with which Joiner had come into contact generally had a much smaller PCB concentration of between 0-to-500 parts per million. The cancer these mice developed was alveologenic adenomas; Joiner had developed small-cell carcinomas. No study demonstrated that adult mice developed cancer after being exposed to PCB's. One of the experts admitted that no study had demonstrated that PCB's lead to cancer in any other species.

522 U.S. at 144 (footnote omitted).

Continuing, the Court in *Joiner* stated:

> Respondent failed to reply to this criticism. Rather than explaining how and why the experts could have extrapolated their opinions from these seemingly far-removed animal studies, respondent chose "to proceed as if the only issue [was] whether animal studies can ever be a proper foundation for an expert's opinion." Of course, whether animal studies can ever be a

[9](...continued)
'subjective belief or unsupported speculation.'" *Joiner*, 522 U.S. at 140 (citation omitted).

14

proper foundation for an expert's opinion was not the issue. The issue was whether *these* experts' opinions were sufficiently supported by the animal studies on which they purported to rely. The studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them.

*Id.* at 144-45 (citation omitted and emphasis in original). Simply put, an expert's professed reliance on accepted methodologies is not enough. The gatekeeping responsibilities imposed under *Daubert/Wilt* require an examination to determine whether the opinion reached through that methodology is itself valid–and if, upon inquiry, the opinion is not scientifically sound, the gate is supposed to swing shut.

As one court has observed, *"Daubert* commands that in court, science must do the speaking, not merely the scientist." *Cavallo v. Star Enter.*, 892 F.Supp. 757, 761 (E.D. Va. 1995). By simplistically viewing the mere qualification as an expert as all that was necessary to get the opinions of these experts before the jury, the majority missed the mark. And, by taking that tack, the majority indirectly shirked the trial court's gatekeeping duties. When *Daubert* is not applied as intended–to keep unreliable "scientific" evidence out of the courtroom–the plaintiff not only gets a pass, so to speak, but the objective of assuring that experts employ the same "intellectual rigor" in their courtroom testimony as in their relevant field is thwarted.[10] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Not only

---

[10]The ease with which the majority dismisses contrary authority as inconsistent with
(continued...)

that, but to borrow the seemingly prophetic words of the majority's author, "I fear that the majority opinion will metastasize beyond simply this case and hazard all of our carefully crafted . . . [*Daubert/Wilt*] jurisprudence." *Taylor,* 215 W.Va. at 87, 593 S.E.2d at 658 (Davis, J., dissenting). Accordingly, I am compelled to respectfully dissent.

---

[10](...continued)
our standards for admissibility is quite alarming as all of our law on this issue has previously both emanated from and been in accord with federal law. *See Harris v. CSX Transp., Inc.,* __ W.Va. __, n.35, __ S.E.2d __, n.35 (No. 12-1135, filed November 13, 2013).